**STATE of Alaska, Petitioner,**

v.

**Joseph J. HAZELWOOD, Respondent.**

**No. S–7602.**

Supreme Court of Alaska.

Oct. 3, 1997.

Eric A. Johnson, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, Bruce M. Botelho, Attorney General, Juneau, for Petitioner.

James H. McComas, Friedman, Rubin and White, Anchorage, and Richard H. Friedman, Friedman, Rubin and White, Anchorage, for Respondent.

Before COMPTON, C.J., and RABINOWITZ and MATTHEWS, JJ.

### OPINION

RABINOWITZ, Justice.

## I. INTRODUCTION

In this petition we are called upon to decide whether due process under Alaska's Constitution requires that a criminal offense be predicated on proof of more than just simple civil negligence.

## II. FACTS AND PROCEEDINGS

Respondent's conviction stems from the *Exxon Valdez* incident. On March 24, 1989, Captain Joseph Hazelwood ran his ship aground off Bligh Reef and reported he was "evidently leaking some oil." Eventually, eleven million gallons poured into Prince William Sound. A jury subsequently convicted Hazelwood of negligent discharge of oil.

The Court of Appeals reversed Hazelwood's conviction on the basis that some of the evidence admitted at trial had been derived from Hazelwood's immunized oil spill report. The court held that these statements could not have been admitted even if they would inevitably have been discovered from an independent source. *Hazelwood v. State,* 836 P.2d 943 (Alaska App.1992). This Court reversed, holding that the inevitable discovery doctrine does apply to the immunity created by 33 U.S.C. § 1321(b)(5) for oil spill reports. *State v. Hazelwood,* 866 P.2d 827, 834 (Alaska 1993).

On remand, the Court of Appeals again reversed Hazelwood's conviction. This time it held that Hazelwood should have been tried under a criminal negligence theory rather than the civil negligence standard of culpability. The court ruled that criminal convictions may be predicated on findings of simple or ordinary negligence only when the offense involves a heavily regulated commercial activity. *Hazelwood v. State,* 912 P.2d 1266, 1279 (Alaska App.1996). Since the application of former AS 46.03.790 is not restricted to heavily regulated industries, the Court of Appeals concluded that Hazelwood's conviction under a civil negligence standard was a denial of due process. We granted the state's petition for hearing and now reverse.

## III. DISCUSSION

The difference between criminal and civil negligence although not major is distinct. Under both standards, a person acts "negligently" when he fails to perceive a substantial and unjustifiable risk that a particular result will occur.

■ The two tests part ways in their descriptions of the relevant unobserved risk. Under ordinary negligence, "the risk must be of such a nature and degree that the failure to perceive it constitutes a deviation from the standard of care that a reasonable person would observe in the situation." *Id.* at 1278. Criminal negligence requires a greater risk. This standard is met only when the risk is

of such a nature and degree that the failure to perceive it constitutes a *gross* deviation from the standard of care that a reasonable person would observe in the situation. *Criminal negligence is something more than the slight degree of negligence necessary to support a civil action for damages and is negligence of a degree*

*so gross as to be deserving of punishment.*

*Id.* at 1278–79 n. 16 (emphasis added).

■ In essence, then, the criminal negligence standard requires the jury to find negligence so gross as to merit not just damages but also punishment. It does not spill over into recklessness; there is still no requirement that the defendant actually be aware of the risk of harm. However, criminal negligence does require a more culpable mental state than simple, ordinary negligence.[1]

The statute under which Hazelwood was convicted provides in relevant part:

> A person may not discharge, cause to be discharged, or permit the discharge of petroleum ... into, or upon the waters or land of the state except in quantities, and at times and locations or under circumstances and conditions as the department may by regulation permit....

Former AS 46.03.790(a) (current AS 46.03.740). At the time of the alleged crime, a person who "negligently" violated this provision was guilty of a class B misdemeanor. Id.[2]

■ The Court of Appeals concluded that the unadorned use of the word "negligently" created an ambiguity as to whether the statute rests on criminal or ordinary negligence. Relying on its past decisions, the court held that criminal liability may be imposed on the basis of simple or ordinary negligence "only for offenses dealing with heavily regulated activities for which permits or licenses are required." *Hazelwood*, 912 P.2d at 1279 (quoting *Cole v. State*, 828 P.2d 175, 178 (Alaska App.1992)).[3]

In defense of the Court of Appeals' ruling, Hazelwood presents two lines of argument. First, he contends the guarantee of due process demands that criminal penalties be predicated on more than just ordinary negligence. He reads our precedents as requiring a mens rea of at least reckless culpability for criminal offenses. Second, Hazelwood maintains that the statute under which he was convicted itself incorporates the criminal negligence standard. We address each argument in turn.

### A. Due Process and a Civil Negligence Mens Rea Standard

#### 1. Alaska law

■ Hazelwood grounds his due process claim in our decisions in *Hentzner v. State*, 613 P.2d 821 (Alaska 1980); *Kimoktoak v. State*, 584 P.2d 25 (Alaska 1978); *Alex v. State*, 484 P.2d 677 (Alaska 1971); and *Speidel v. State*, 460 P.2d 77 (Alaska 1969). He contends that in each of these cases we required a showing of recklessness, or subjective awareness of wrongdoing, in order to sustain the criminal conviction.

■ These decisions stand for a common proposition: that criminal convictions must be predicated on criminal intent.[4] In other words, there must be some level of

---

1. *Accord Commonwealth v. Heck*, 341 Pa.Super. 183, 491 A.2d 212, 216 (1985), *aff'd*, 517 Pa. 192, 535 A.2d 575 (1987) ("While both criminal negligence and recklessness involve 'gross' deviations from reasonable conduct, recklessness includes conscious disregard of a risk whereas criminal negligence is accompanied by lack of awareness of a risk.").

2. A person convicted of a class B misdemeanor at the time of Hazelwood's offense could be "sentenced to a term of imprisonment of not more than 90 days." AS 12.55.135(b).

3. Because this ruling is a legal conclusion, we review *de novo*. *See Aviation Associates v. TEMSCO Helicopters*, 881 P.2d 1127, 1130 n. 4 (Alaska 1994).

4. See *Hentzner*, 613 P.2d at 825 ("[C]riminal intent is an essential predicate of criminal liability.") (citing *Speidel*, 460 P.2d at 78); *Kimoktoak*, 584 P.2d at 29 ("It is well-settled that an act or omission can result in serious criminal liability only when a person has the requisite criminal intent."); *State v. Guest*, 583 P.2d 836, 838 (Alaska 1978) ("[I]t would be a deprivation of liberty without due process of law to convict a person of a serious crime without the requirement of criminal intent.") (citing *Speidel, Alex,* and *Kimoktoak*); *Alex*, 484 P.2d at 681 ("[T]o constitute guilt there must be not only a wrongful act but a criminal intention."); *Speidel*, 460 P.2d at 80 ("To convict a person of a felony for such an act [failure to return a rental car], without proving criminal intent, is to deprive such person of due process of law.").

Article I, section 7, of the Alaska Constitution provides: "No person shall be deprived of life, liberty, or property without due process of law."

mental culpability on the part of the defendant. However, this principle does not preclude a civil negligence standard. What it does mean is that we will generally read into a criminal statute some level of mens rea, "*as opposed to strict criminal liability.*" *Alex,* 484 P.2d at 681 (emphasis added); *see also Kimoktoak,* 584 P.2d at 29. It is strict liability, and not the negligence standard, which "is an exception to the rule which requires criminal intent." *State v. Rice,* 626 P.2d 104, 108 (Alaska 1981). The requirement of criminal intent does "not emphasize a specific awareness of wrongfulness." *Alex,* 484 P.2d at 681.[5]

The point is illustrated by *State v. Guest,* 583 P.2d 836 (Alaska 1978), and *Rice,* 626 P.2d at 104. In each case, we upheld the imposition of criminal sanctions on the basis of simple, ordinary negligence. *Guest* approved the Superior Court's instruction that the defendant was not guilty of statutory rape if he reasonably believed his victim was of consenting age. In effect, we sustained prosecution on charges that the defendant was negligent as to the victim's age. *See Guest,* 583 P.2d at 839 n. 5 (quoting Wayne R. LaFave & Austin W. Scott, Jr., *Criminal Law* § 47, at 356–57 (1972)). Similarly, *Rice* read into a criminal prohibition on transportation of illegally taken game a requirement that the defendant was at least negligent as to the fact the game was illegally taken. *See Rice,* 626 P.2d at 110. In both cases, a mens rea of simple or ordinary negligence was made the basis of the offense.

### 2. *Hazelwood's conduct/circumstances distinction*

█ Hazelwood distinguishes *Rice* and *Guest* on the ground that in each the negligence standard was applied only to the circumstances of the crime, not the underlying conduct. Due process, he maintains, still requires the government to demonstrate there was "volitional conduct of the prohibited act."

Hazelwood's conduct/circumstances distinction is untenable. As an initial matter, we note that nowhere do our due process precedents differentiate between the minimum mens rea for circumstances and conduct. Nor is there any reason to do so. In many cases, it is only the circumstances of the offense that render it objectionable. No one would suggest, for example, that Rice's transportation of game would still have been criminally sanctionable had it not been taken illegally. The statute proscribes the underlying conduct only when the relevant circumstance is present. The same was true in *Guest.* Indeed, in both cases, had we not applied a negligence standard to the circumstance of the offense, it would have included no mens rea element whatsoever.

█ We think Hazelwood confuses volition with intent. While many crimes do not require that their underlying action be carried out with a guilty mind, it is always a defense to prosecution that the conduct was not voluntary. In every case, the alleged infraction must have been the product of a free will, and not coercion, duress, or mental illness. Had terrorists boarded the *Exxon Valdez,* for example, and demanded that Hazelwood run his vessel onto Bligh Reef, the fact that he did so even with knowledge and purpose would be irrelevant. He could defend on the basis that his act was not voluntary, and thus could not be properly attributed to him. This is not the case here. Hazelwood faced no compulsion that would excuse his conduct at the time the *Exxon Valdez* rammed into Bligh Reef. While there is a voluntariness element to every criminal offense, because Hazelwood's commissions were his and his alone, this prerequisite is satisfied here.[6]

As noted above, it is firmly established in our jurisprudence that a mental state of simple or ordinary negligence can support a criminal conviction. Further decisions reveal, however, that in some situations more will be required, and sometimes less. *Spei-*

---

5. *See also* J. Salmond, *Jurisprudence* 410 (8th ed. 1930) ("[n]egligence ... is rightly treated as a form of *mens rea,* standing side by side with wrongful intention as a formal ground of responsibility").

6. For further elaboration of the distinction between intent and volition see James B. Brady, *Punishment for Negligence: A Reply to Professor Hall,* 22 Buff. L.Rev. 107, 109–16 (1972).

*del,* 460 P.2d at 80, found a denial of due process where the defendant had been convicted of "simple neglectful or negligent failure to return a rented automobile." In that case, we insisted on at least a finding of reckless culpability in order for criminal sanctions to be imposed.

On the other hand, elsewhere we have allowed the mens rea element to be dispensed with entirely. We have allowed strict liability to be read into "public welfare offenses." *See, e.g., Rice,* 626 P.2d at 107. These public welfare offenses are proscriptions which "heighten the duties of those in control of particular industries, trades, properties or activities that affect public health, safety or welfare." *Morissette v. United States,* 342 U.S. 246, 254, 72 S.Ct. 240, 245, 96 L.Ed. 288 (1952). *See also Haxforth v. Idaho,* 117 Idaho 189, 786 P.2d 580, 582 (App.1990) (four-part test). As a corollary, a mens rea requirement is imputed only when a serious penalty attaches. *See Guest,* 583 P.2d at 838; *Kimoktoak,* 584 P.2d at 29; and *Speidel,* 460 P.2d at 80; *see also People v. Olson,* 181 Mich.App. 348, 448 N.W.2d 845, 847 (1989). Also, no mental element will be required when a statute provides "clear legislative intent to the contrary." *Rice,* 626 P.2d at 108; *see also Lambert v. California,* 355 U.S. 225, 228, 78 S.Ct. 240, 242–43, 2 L.Ed.2d 228 (1957) ("There is wide latitude in the lawmakers to declare an offense and to exclude elements of knowledge and diligence from its definition."); *cf. Gregory v. State,* 717 P.2d 428, 430 (Alaska App.1986).

An explanation of why the simple or ordinary negligence standard is nevertheless appropriate in this case requires consideration of the reasons that variable levels of mens rea will satisfy due process for different offenses.

### 3. *The strict liability tradition*

The rule that a criminal offense exists at the intersection of a guilty act and a guilty mind is commonly viewed as the bedrock of criminal common law. Over two centuries

ago, Blackstone wrote, "[T]o constitute a crime against human laws, there must first be a vicious will, and secondly an unlawful act consequent upon such a vicious will." 4 Comm. 21. A century and a half later Bishop affirmed: "There can be no crime large or small without an evil mind." 1 Bishop, *Criminal Law* (9th ed.1930) § 287.[7]

Yet throughout our common law history, a parallel tradition has allowed imposition of penalties without formal proof of criminal intent. An early version of strict liability, the law of deodands, has been traced back to early Western history. A deodand was an object that was forfeited to the Crown for directly or indirectly causing the death of a human being. *See generally,* Oliver Wendell Holmes, Jr., *The Common Law* 24–25 (1881). The original reasoning was that the instrument itself was guilty of the offense.

Although the deodand form was abolished in England in 1846, 9 & 10 Vict. c. 62, and never was incorporated into the American common law, *see Parker–Harris Co. v. Tate,* 135 Tenn. 509, 188 S.W. 54 (1916), its substance survives in contemporary in rem proceedings. The object itself, rather than its human owner, is formally charged. *See, e.g., One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965); *United States v. 43 Gallons of Whiskey,* 93 U.S. 188, 23 L.Ed. 846 (1876); *United States v.1960 Bags of Coffee,* 12 U.S.(8 Cranch) 398, 3 L.Ed. 602 (1814). The Supreme Court of the United States has recently affirmed that proof of the moral culpability of the owner is not a necessary predicate to these punitive forfeitures. *See Bennis v. Michigan,* —— U.S. ——, 116 S.Ct. 994, 134 L.Ed.2d 68 (1996). *Bennis* upheld a modern-day deodand of sorts, allowing the state to seize and forfeit an automobile without any showing that the owner knew her husband might use the vehicle to solicit prostitutes. *Id.*

In the same year the deodand rule was repealed in England, a new practice began to develop in its place on both sides of the

---

**7.** *See also Morissette,* 342 U.S. at 250, 72 S.Ct. at 243 ("The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal

and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.").

Atlantic. In *Regina v. Woodrow*, 15 M. & M. 404 (Exch.1846), the Court of Exchequer allowed the imposition of a £200 fine on a tobacco dealer for possession of adulterated tobacco, without evidence the dealer "had knowledge or cause to suspect" the product's condition. Per Pollock, C.B., at 415, 416. The case was reaffirmed in *Regina v. Stephens*, L.R. 1 Q.B. 702 (1886). The Court accepted that a new class of offenses without a mens rea element had come into being. While many of these statutes were a product of technological change [8] or modern sensibilities,[9] and thus had no common law antecedent, others overlaid old crimes which had once included an intent element.[10] The Court summed up the development in *Cundy v. LeCocq*, L.R. 13 Q.B.D. 207 (1884):

> In old time, and as applicable to the common law or to earlier statutes the maxim [that in every criminal offense there must be a guilty mind] may have been of general application; but a difference has arisen owing to the greater precision of modern statutes. It is impossible now . . . to apply the maxim generally to all statutes, and the substance of all the reported cases is that it is necessary to look at the object of each Act that is under consideration to see whether and how far knowledge is of the essence of the offence created.

*Id.* at 210 (Stephen, J.) (upholding strict liability conviction for selling alcohol to an intoxicated person).

On this shore, courts also began to allow penalties for certain offenses without proof of intent during this era. The practice first took root in Massachusetts, apparently quite independently of the English cases, and spread quickly from there.[11] Again, crimes which had recently required criminal intent could now be punished without it.[12]

### 4. Theories of strict liability

Over the years, several authorities have attempted to define the appropriate role and scope of the strict liability offense. In 1933, Professor Sayre catalogued all such crimes appearing in reports. His classifications include sales of alcohol to minors, alcoholics, Indians, soldiers, students and slaves; sales of impure foods, particularly milk and butter; sales of misbranded articles; and various automobile and traffic regulations. *See* Sayre, *supra* n. 11, at 84–87. However, Professor Sayre was unable to avoid employing the broad categories of "Criminal Nuisances" and "General Police Regulations for the Safety, Health or Well–Being of the Community." He recommends that strict liability crimes be enforced with light penalties, though he concedes this limit has not been followed. *Id.* at 72, 79–82. He concludes with the generality that the abandonment of mens rea is suited to situations where the need for social order outweighs the need for individualized punishment.[13] *Id.*

**8.** *See, e.g., Provincial Motor Cab Co. v. Dunning*, 2 K.B. 599 (1909) (automobile safety rules).

**9.** *See, e.g., Stonehouse v. Masson*, 2 K.B. 818 (1921) (strict liability for fortune telling); *Regina v. Bishop*, L.R. 5 Q.B.D. 259 (1880) (housing lunatics).

**10.** Compare *Regina v. Stevenson*, 3 Fost. & F. 106 (N.P.1862) (requiring proof of butcher's knowledge of unfitness for offense of selling unsound meat), with *Hobbs v. Winchester Corp.*, 2 K.B. 471 (1910) (conviction under Public Health Act of 1875 does not require proof that butcher could have known of meat's unsoundness).

**11.** *See* Francis Bowes Sayre, *Public Welfare Offenses*, 33 Colum. L.Rev. 55, 62, 64 (1933). Professor Sayre's work has aged well; his article supplied the label "public welfare offense" and has been influential in high places. The Supreme Court adopted as a federal rule of statutory construction his criteria for boxing in strict liability crimes in *Morissette*, 342 U.S. 246, 72

S.Ct. 240, 96 L.Ed. 288. *Compare id.* at 256–57, 260–62, 72 S.Ct. at 246–47, 248–49, and Sayre, *supra*, at 72.

**12.** *Compare Miller v. State*, 3 Ohio St. 475, 487 (1854) (requiring intent for offense of selling alcohol to a minor); and *Duncan v. State*, 26 Tenn. 148, 7 Humph. 148, 150 (1846) (intent required for offense of transporting slave without master's consent); with *McCutcheon v. People*, 69 Ill. 601 (1873) (interpreting Illinois statute adopted from the Ohio one as not requiring mens rea); and *State v. Baltimore and Susqu. Steam Co.*, 13 Md. 181 (1859) (no intent required).

**13.** In *Morissette*, the Supreme Court draws attention to the need for greater regulation created by the changes wrought by the industrial revolution. Echoing Sayre, the Court emphasizes light penalties and protecting "the efficiency of controls deemed essential to the social order as presently constituted." *Morissette*, 342 U.S. at 260, 72 S.Ct. at 248. Ultimately, though, the Court al-

Some jurisdictions differentiate between offenses that are *mala in se* and *mala prohibita,* allowing strict liability only for the latter. *See* Sayre, *supra* n. 11, at 70 n. 55. Although this court has relied on this difference, these other jurisdictions' decisions are of little guidance to us, as we have drawn the opposite conclusion from the distinction. *See Hentzner,* 613 P.2d at 826 (separate intent element not necessary for offenses that are *mala in se* ).

Generally, those courts that dispense with criminal intent for crimes that are *mala prohibita,* that is, not patently immoral, have followed the rationale that the legislature did not intend these new offenses to carry a mental element. The very meaning of *malum prohibitum* is that it is wrong because it is prohibited. Common law crimes, which by their nature are wrongful, require scienter because moral culpability is inherent to the offense. The courts have reasoned, however, that when conduct is penalized only because of a legislative command, then the nature of the proscription derives solely from that mandate. If the statute did not include a mental element, then the crime was not meant to have one.

The *malum in se /malum prohibitum* distinction overlaps with another theme in this area, that of deference to legislative direction. Courts routinely hold that whether scienter is an element of a charged offense "is a question of legislative intent to be construed by the Court." *United States v. Balint,* 258 U.S. 250, 252, 42 S.Ct. 301, 302, 66 L.Ed. 604 (1922). Even *Morissette* concedes that the concerns raised by the exclusion of mens rea "would not justify judicial disregard of a clear command to that effect from Congress." *Morissette,* 342 U.S. at 254 n. 14, 72 S.Ct. at 245 n. 14. *Compare State v. Rice,* 626 P.2d 104, 108 (Alaska 1981). Since, by its terms, the *malum prohibitum* offense is a creature of statute rather than common law, it is here that courts will most often defer to legislative intent.

lows that it does not undertake "to delineate a precise line or set forth comprehensive criteria for distinguishing between crimes that require a mental element and crimes that do not." It concedes that the law in this area is "neither settled nor static." *Id.*

Although widely accepted, the *mala in se* and legislative discretion approaches in our view remain unsatisfactory. We note that even crimes which had traditionally required proof of criminal intent have been recharacterized as strict liability crimes. *See, e.g., McCutcheon,* 69 Ill. at 601; *Baltimore & Susqu. Steam Co.,* 13 Md. at 186. Nevertheless, we reject any rule that grants the legislature unbridled discretion to impose strict liability crimes. An exception to the mens rea requirement for "clear legislative intent to the contrary" has the potential to swallow the rule. As we said in *Speidel,* even where a statute is explicit, due process will on occasion require a higher degree of culpability. 460 P.2d at 80 (replacing the negligence threshold of AS 28.35.026 with a recklessness standard).

### 5. *The principle of reasonable deterrence*

An appropriate place to begin an explanation for objective fault crimes [14] is with the objections of those who would abolish them altogether. In Jerome Hall, *Negligent Behavior Should Be Excluded from Penal Liability,* 63 Colo. L.Rev. 632 (1963), Professor Hall challenges the alleged utility of sanctions based on negligence and strict liability. He contends crimes that are not based on subjective awareness of wrongdoing are, by their terms, not addressed to "the extremely important degree of individual freedom, autonomy, and awareness ... expressed in (voluntary) action by a normal adult." *Id.* at 637. Merely negligent harm doers, contends Professor Hall, "have not in the least thought of their duty, their dangerous behavior, or any sanction." *Id.* at 641 (footnote omitted).

The difficulty with this thesis is that it assumes legal regulations can operate only through the offender's conscious reason. A rebuttal is supplied by Professor Hart:

the connexion between the threat of punishment and subsequent good behavior is not [always] of the rationalistic kind pic-

14. These are offenses that are based either on strict liability or negligence; they do not require any subjective awareness of wrongdoing on the defendant's part.

tured in the guiding-type of case. The threat of punishment is something which causes [the offender] to exert his faculties, rather than something which enters as a reason for conforming to the law when he is deliberating whether to break it or not. It is perhaps more like a goad than a guide. But there seems to me to be nothing disreputable in allowing the law to function in this way, and it is arguable that it functions in this way rather than in the rationalistic way more frequently than is generally allowed.

H.L.A. Hart, *Punishment and Responsibility* 134 (1968).

The law's "goad," rather than its guide, is also emphasized by Professor LaFave. He asks whether more than civil negligence should be required for a criminal offense, and concludes "that there is no need to choose one answer for all crimes." His primary focus is on deterrence:

> The principal policy question is whether the threat of punishment for objective fault will deter people from conducting themselves in such a way as to create risk to others. Though the matter is disputed, it would seem that some people can be made to think, before they act, about the possible consequences of acting, so that the existence of objective-fault crimes does tend to reduce risky conduct.... The point is that the legislature might, in the exercise of its police power, require subjective fault for some crimes and objective fault for other crimes.

1 LaFave at 337–38 (footnotes omitted).

It is here, grounded in a theory of reasonable deterrence, that any explanation for objective fault crimes must have its origins. Despite Professor Hall's challenge, it cannot be disputed that the threat of punishment necessarily deters. Even when an offender does not of his own accord realize that his conduct is wrong, he can in many cases be made to take care. Coercion that causes the offender to pay attention can serve important social aims that would not be achieved by proscriptions that only come into effect when the transgressor recognizes the harm in his or her behavior.

■ The fulcrum for deciding what level of intent is the absolute minimum for a particular offense is a question of when an expectation of individual conformity is reasonable. Due process under Alaska's Constitution requires that social interests be weighed against those of the individual. While society's interest in obtaining compliance with its regulations is strong, it can never outweigh the individual's interest in freedom from substantial punishment for a violation he or she could not reasonably have been expected to avoid. The threshold question, then, is whether the defendant's conduct is something which society could reasonably expect to deter.

■ The principle of reasonable deterrence allows the imposition of strict liability in some circumstances. Generally, a separate mental element need not be proved when the failure to abide by a rule is inherently unreasonable. This occurs, for instance, where a person's conduct is hedged in by regulation, such that one may readily assume his or her routine decisions are guided by rules. Thus, strict liability is permitted for heavily regulated industries. *See Cole v. State*, 828 P.2d 175, 178 (Alaska App. 1992). Persons operating in rule-laden environments, and whose actions have a substantial impact on public health, safety, or welfare, can reasonably be assumed aware of their governing codes.

Another type of law whose violation is inherently unreasonable is the *malum in se* offense. As we explained in *Hentzner*, these are crimes which "reasoning members of society regard as condemnable," such that "awareness of the commission of the act necessarily carries with it an awareness of wrongdoing." 613 P.2d at 826.

Finally, an exception exists for those regulations which call for only a modest fine. Generally, their underlying conduct is not so inherently unwholesome that it can be reasonably assumed the misdemeanant was aware of its wrongfulness. Indeed, these punishments usually aim to coerce the public at large, and are meant to influence behavior by their very infliction. There is no implied assumption that the transgressor reasonably should have been aware he or she had

stepped outside the law. Broad strict liability of this sort normally would run afoul of due process,[15] but here it is allowed because the penalties are light.

Reasonable deterrence, then, is the basic principle of the due process balance between individual and societal interests. The ultimate question is whether society can reasonably expect the individual to conform his or her conduct to the law. For the strict liability exceptions, a separate showing of a departure from social mores is unnecessary, as it can reasonably be presumed.[16] This notion of a duty of reasonable social conformity undergirds the entire law of mens rea.

Within the confines of this understanding, we will defer to the legislature's directives. It appropriately decides what conduct is inherently wrongful to reasoning members of society and when the social interest requires enforcement without mens rea. However, for deference to be accorded, it must be reasonably apparent that the enactment was in exercise of such judgment. Strict liability cannot be applied simply to expedite punishment when there is no reasonable expectation of deterrence.

### 6. The sufficiency of simple negligence

Outside of these strict liability exceptions, though, a separate showing of simple civil

negligence is both necessary and sufficient under Alaska's Constitution. Negligence, rather than gross negligence, is the minimum, not because we believe it is the necessary element of every prosecutor's case; indeed, all courts have allowed a separate showing of mental culpability to be dispensed with altogether in some circumstances. Rather, the negligence standard is constitutionally permissible because it approximates what the due process guarantee aims at: an assurance that criminal penalties will be imposed only when the conduct at issue is something society can reasonably expect to deter.[17]

Partisans of the criminal negligence approach have expressed the concern that an ordinary negligence standard gives the criminal proceeding an unseemly resemblance to tort law. *Commonwealth v. Heck,* 341 Pa.Super. 183, 491 A.2d 212, 224 (1985), *aff'd,* 517 Pa. 192, 535 A.2d 575 (1987), which adopts criminal negligence as a minimum, notes that the civil law standard serves purposes unsuited to the "harshness of criminal punishment." Tort aims simply to "shift the economic costs of injuries onto those responsible for them." [18] *Id.*

This desire to differentiate criminal proceedings from civil proceedings appears to

**15.** *See Anderson v. State,* 27 Tex.App. 177, 11 S.W. 33, 34 (1889) ("To coerce by criminal prosecution every person to supervise all other persons and things, would destroy that division of labor and responsibility by which alone business can be safely conducted.... Nothing can be effectually guarded when everything is to be guarded by everybody.")

**16.** In other words, even strict liability crimes do not dispense with the requirement of criminal intent. Rather, because they rest on a fair presumption of unreasonableness, they do not require that negligence be shown separately.

**17.** We note also that the overwhelming majority of jurisdictions allow crimes based on ordinary negligence. *See Daniels v. People,* 159 Colo. 190, 411 P.2d 316, 317–18 (1966); *State v. Miles,* 203 Kan. 707, 457 P.2d 166, 169–70 (1969); *Commonwealth v. Burke,* 6 Mass.App.Ct. 697, 383 N.E.2d 76, 78–80 (Mass.1978); *People v. Olson,* 181 Mich.App. 348, 448 N.W.2d 845 (1989) (two year sentence upheld); *People v. McKee,* 15 Mich. App. 382, 166 N.W.2d 688, 691 (1968); *State v. Smith,* 90 N.C.App. 161, 368 S.E.2d 33 (1988), *aff'd,* 323 N.C. 703, 374 S.E.2d 866 (1989); *State v. Jenkins,* 278 S.C. 219, 294 S.E.2d 44 (1982);

*State v. LaBonte,* 120 Vt. 465, 144 A.2d 792, 794 (1958) ("the power of a legislature to define a crime based upon ordinary negligence has been recognized in numerous jurisdictions"). *Cf. State v. Hedges,* 8 Wash.2d 652, 113 P.2d 530, 536 (1941) (whether to use negligence or gross negligence is a "matter within the province of the legislature").

**18.** A noteworthy aspect of *Heck* is that while the vehicular homicide statute at issue there required a negligence standard, the lower court had found there was negligence per se because the defendant had committed a minor traffic violation. *See Heck,* 341 Pa.Super. at 189, 491 A.2d 212. While we decline to follow *Heck's* lead in adopting the criminal negligence standard, we find that that court's due process concerns were justified. Although a jury finding of ordinary negligence is ordinarily sufficient, that finding has not been made when negligence per se is invoked; such an approach does not satisfy the requirement of criminal intent unless the underlying infraction meets one of the exceptions for strict liability.

drive the definition of criminal negligence. That standard is typically characterized as "something more" than ordinary negligence. *See Andrews v. Director of Pub. Prosecutions,* 26 Crim.App. Rep. 34 (1937) ("similar lack of care such as will constitute civil liability is not enough") (Lord Atkin). Thus the only consensus and precision available in the definition of criminal negligence is that it is not civil negligence.[19]

This fear of tort standards is unfounded. In response to similar allegations that civil standards do not protect, the Michigan Supreme Court has noted that "[i]t is just as much a violation of the due process clause of the Constitution to take property as it is to take the liberty of a person." *People v. McMurchy,* 249 Mich. 147, 228 N.W. 723 (1930). In other words, the same constitutional clause which governs the criminal prosecution would also govern a civil proceeding, and it is undisputed that due process is satisfied by the negligence standard in that forum.

We are not persuaded that the simple or ordinary civil negligence standard is inadequate to protect Hazelwood's interests. We conclude that the Superior Court's adoption of an ordinary civil negligence mens rea standard in its instructions to the jury did not constitute a denial of due process under article I, section 7 of the Alaska Constitution.

### B. *The Statute*

Hazelwood next contends that the statute under which he was convicted, former AS 46.03.790(a), itself incorporates the criminal negligence mens rea standard. His argument is unconvincing. The legislature made "negligence" the standard of liability. Unadorned, this word is commonly understood to mean ordinary negligence, not criminal or gross negligence. Nowhere in the criminal code is an ordinary negligence standard applied through the words "civil negligence" or "ordinary negligence." These added terms are used only when differentiating common negligence from criminal negligence. Otherwise, criminal negligence is always referred to specifically, and "negligence" always denotes ordinary, civil negligence.[20]

Hazelwood also contends that the legislative history of AS 46.03.790(a) points to an intent to incorporate a criminal negligence standard. Specifically, he relies on Governor Sheffield's transmittal letter accompanying the proposed bill that eventually added the negligence standard to § 790.[21] The letter states that the proposed change aims to

> bring the existing provisions into conformity with language and penalty levels in the Revised Criminal Code. . . .
>
> [To this end, it recommends] changing the criminal "state of mind" provision from "willful" to "knowing," for class A misdemeanors, while making clear that "negligent" violations are intended to be class B misdemeanors. . . .

1984 Alaska Senate Journal 2079–80.

Hazelwood contends that the reference to the Revised Criminal Code suggests an intent to adopt the "criminal negligence" standard defined in the Code. We draw the opposite inference. The Governor's letter exhibits an awareness of the Code and its provisions, which included the criminal negligence standard. Yet the letter only speaks of negligence, not the special criminal negligence test. We can only conclude that the Governor's office knew of the criminal negligence provision and consciously chose to forego this more exacting standard in favor of simple negligence. This interpretation is consistent with the settled rule that a difference in language implies a dif-

---

**19.** The Model Penal Code also adopts the criminal negligence standard. The commentators concede, however, that

> it is quite impossible to avoid tautological articulation of the final question. The tribunal must evaluate the actor's failure of perception and determine whether, under all the circumstances, it was serious enough to be condemned. The jury must find fault, and must find that it was substantial and unjustified.

> That is the heart of what can be said in legislative terms.

*Model Penal Code,* § 2.02, cmt. 4.

**20.** For a like construction, see *Commonwealth v. Berggren,* 398 Mass. 338, 496 N.E.2d 660, 661 (1986); *State v. Johnson,* 12 Utah 2d 220, 364 P.2d 1019, 1019–20 (1961); *State v. LaBonte,* 120 Vt. 465, 144 A.2d 792, 794–95 (1958).

**21.** Ch. 77, § 8, SLA 1984.

ference in meaning. *See Neal v. Honeywell, Inc.*, 33 F.3d 860, 863 (7th Cir.1994); *United Parcel Serv. v. State, Dep't of Revenue*, 102 Wash.2d 355, 687 P.2d 186, 191 (1984).

## IV. *CONCLUSION*

The Superior Court's adoption of an ordinary negligence standard was not erroneous. We therefore REVERSE the holding of the Court of Appeals on this issue. The case is remanded to the Court of Appeals for consideration of any unresolved issues originally raised by Hazelwood on appeal.[22]

EASTAUGH and FABE, JJ., not participating.

COMPTON, Chief Justice, dissenting.

## I. *INTRODUCTION*

I am not persuaded that a criminal offense can be predicated on proof of civil negligence. In my view, neither existing precedent nor public policy supports such a result. I therefore dissent.

## II. *DISCUSSION*

### A. *The Ambiguity as to the Required Mens Rea under Former AS 46.03.790(a) Mandates Application of the Criminal Negligence Standard.*

The court does not deny that there is an ambiguity as to the *mens rea* required for conviction under former AS 46.03.790(a).[1] "Ambiguities in criminal statutes must be

narrowly read and construed strictly against the government." *State v. Andrews*, 707 P.2d 900, 907 (Alaska App.1985), opinion adopted by *State v. Andrews*, 723 P.2d 85, 86 (Alaska 1986); *see also Wells v. State*, 706 P.2d 711, 713 (Alaska App.1985) ("It is well established that, in accordance with the rule of lenity, ambiguities in penal statutes must be resolved in favor of the accused."); *Manderson v. State*, 655 P.2d 1320, 1323 (Alaska App.1983) ("Since the provision is ambiguous and both the state's and [the defendant's] interpretations are arguably reasonable, we agree that [the defendant's interpretation] should prevail under the *Bell [v. U.S.*, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955)] 'rule of lenity.' "). Accordingly, the statute must be construed to require criminal negligence, rather than civil negligence.[2] That should end the discussion.

### B. *Alaska Precedent Mandates Application of a Criminal Negligence Standard.*

Turning to the merits of the decision, the opinion of the court does considerable violence to precedent. In *Speidel v. State*, 460 P.2d 77 (Alaska 1969), we expressly rejected a civil negligence standard as defining the minimum *mens rea* for criminal punishment. *See id.* at 80 ("To convict a person of a felony ... without proving criminal intent, is to deprive such person of due process of law."). The court articulates no basis for distinguishing *Speidel*.[3] I see no basis for concluding

---

**22.** *See State v. Hazelwood*, 866 P.2d 827, 834 n. 15 (Alaska 1993).

**1.** Indeed, the court devotes several pages of discussion to the issue of the proper interpretation of the statute. Maj. op. at 885–886. Such discussion would be unnecessary in the absence of any ambiguity as to the *mens rea* required under the statute.

**2.** It is well established that any ambiguity in a statute should be resolved in favor of a construction that does not raise constitutional concerns. *See Kenai Peninsula Borough v. Cook Inlet Region, Inc.*, 807 P.2d 487, 498 (Alaska 1991) ("[S]tatutes are to be construed to avoid a substantial risk of unconstitutionality where adopting such a construction is reasonable...."). Since application of a civil negligence standard would raise a constitutional question, the statute

must be construed so as not to apply such a standard.

**3.** *Speidel* involved prosecution for a felony, rather than a misdemeanor. It could be argued that the greater the potential punishment, the greater must be the minimum *mens rea* for the crime. It could then be said that since the crime at issue here is a misdemeanor, rather than a felony as in *Speidel*, the minimum *mens rea* is civil rather than criminal negligence.

Such a rule would be preferable to that which the court adopts. A distinction on this basis would limit this holding to misdemeanors, mitigating the dangers inherent in a more expansive holding. It also would seem to be more supportable as a matter of policy to permit misdemeanor penalties based on civil negligence, than it is to permit felony penalties similarly. However, our case law draws no such distinction, nor does the

that *Speidel* does not control, or that it does not require application of a criminal negligence standard.

Many of the decisions upon which the court relies reject strict liability rather than civil negligence, as the court states. Maj. op. at 879. However, these decisions in fact do not authorize civil negligence as the minimum *mens rea* for criminal punishment. *See, e.g., Hentzner v. State*, 613 P.2d 821, 825 (Alaska 1980) (requiring "an awareness of wrongdoing" for criminal liability); *Alex v. State*, 484 P.2d 677, 682 (Alaska 1971) (holding that crime of escape required intentional departure from custody); *Kimoktoak v. State*, 584 P.2d 25, 29–30 (Alaska 1978) (implying in a criminal hit-and-run statute a requirement that the defendant have knowingly failed to stop and render assistance), superseded by statute on other grounds as noted in *Wylie v. State*, 797 P.2d 651, 660 n. 8 (Alaska App.1990). Demonstrably, these cases do not support the proposition that a civil negligence standard provides the minimum *mens rea* for a criminal conviction. To the contrary, these decisions reject a strict liability standard not in favor of a civil negligence standard but in favor of a requirement of "criminal intent." *See, e.g., Hentzner*, 613 P.2d at 825 ("[C]riminal intent is an essential predicate of criminal liability."); *Kimoktoak*, 584 P.2d at 29 (requiring "criminal intent" to support conviction); *Alex*, 484 P.2d at 681 ("[T]o constitute guilt there must be not only a wrongful act but a criminal intention."). It could be argued, as the court concludes, that "criminal intent" means any mental state the legislature determines to be required for the particular crime, excepting only strict liability. However, in *Alex*, the court noted that for "criminal intent" to exist, "[it] is imperative ... that an accused's act be other than simply inadvertent *or neglectful." Alex*, 484 P.2d at 681 (emphasis added). This statement indicates that "criminal intent" entails something more than mere "neglectfulness" or ordinary negligence. This interpretation is strengthened by the fact that the cited

decisions all rest upon, and refer with approval to, our decision in *Speidel*. *See, e.g., Hentzner*, 613 P.2d at 827; *Kimoktoak*, 584 P.2d at 29; *Alex*, 484 P.2d at 681. As noted, *Speidel* rejected a civil negligence standard in favor of a "criminal intent" requirement. *Speidel*, 460 P.2d at 80. "Criminal intent," as defined in *Alex* and *Speidel*, does not include civil negligence.

The court bases much of its argument on *State v. Guest*, 583 P.2d 836 (Alaska 1978), in which the defendant was accused of statutory rape. We noted that "the charge of statutory rape is legally unsupportable under the principles of *Speidel*, *Alex*, and *Kimoktoak* unless a defense of reasonable mistake of age is allowed." *Id.* at 839. To fail to do so would be "to impose criminal liability without any criminal mental element." *Id.* We then observed that

Although AS 11.15.120 is silent as to any requirement of intent, this is true of many felony statutes. The requirement of criminal intent is then commonly inferred. In fact, in such cases, where the particular statute is not a public welfare type of offense, either a requirement of criminal intent must be read into the statute or it must be found unconstitutional. Since statutes should be construed where possible to avoid unconstitutionality, it is necessary here to infer a requirement of criminal intent.

*Id.* (citations and footnotes omitted).

The court mischaracterizes *Guest* in asserting that we "upheld the imposition of criminal sanctions on the basis of simple, ordinary negligence." Maj. op. at 879. To the contrary, the issue in *Guest* involved only whether the defendant's "reasonable belief" that the victim was of the age of consent negated the criminal intent necessarily implied in the statute. *Guest*, 583 P.2d at 839–40. The crime itself involved a separate mental state. The discussion in *Guest* concerning "reasonable belief," which the court

---

court adopt such a rule in this case. Moreover, this case involves a potential sentence of imprisonment for 90 days. This penalty is sufficiently

serious to weaken any argument that "severe" penalties require a heightened mental state,

wrongly equates with "simple negligence,"[4] involved only the defense, and had no bearing on the core elements required for conviction of the charged offense itself. *Guest* did not authorize conviction for "simple negligence," as the court asserts. Moreover, *Guest* did not overrule *Speidel*. Since *Speidel* remains good law notwithstanding *Guest*, it is incorrect to assert that *Guest* approved a civil negligence standard in all cases, as does the court. Since the case at bar considers the "criminal intent" requirement in the context of a core element of the crime in question, rather than in the context of a defense, *Guest* does not apply.

Our jurisprudence recognizes several exceptions to the minimum "criminal intent" requirement outlined in the above cases. None of these exceptions are applicable, nor does the court purport to apply any of them.

*Speidel* recognized an exception for "public welfare" offenses, which relate to the "health, safety, and welfare" of the public, and which carry penalties that "commonly are relatively small, and [do] no grave damage to an offender's reputation." *Speidel*, 460 P.2d at 78–79 (citing *Morissette v. United States*, 342 U.S. 246, 250, 72 S.Ct. 240, 243, 96 L.Ed. 288 (1952)). The crime at issue here carries too severe a potential penalty—imprisonment for ninety days—to fall within this exception. *See State v. Rice*, 626 P.2d 104, 116 (Alaska 1981) (Matthews, J., concurring) ("[A]ny prison sentence is an important, even traumatic, event in the life of a human being.... Further, any prison sentence is likely to have a considerable detrimental effect on one's reputation.").

We also have recognized an exception for activities within a "heavily regulated industry." *See id.* at 107–08. Under that exception, participants in heavily regulated activities have a reduced due process interest as a consequence of that participation, and therefore may be subject to criminal liability un-

der a less culpable *mens rea* than is ordinarily required. *See Beran v. State*, 705 P.2d 1280, 1292 (Alaska App.1985) (Bryner, C.J., concurring) ("[T]he state has a legitimate right to hold participants in the [commercial fishing] industry to a higher standard of care than might otherwise be appropriate as a predicate for criminal responsibility."). As the captain of an oil tanker, Hazelwood certainly qualifies as a participant in a heavily regulated industry. However, former AS 46.03.790(a) applied not only to participants in oil production operations, but also to members of the general public. The statute therefore cannot be construed to require a mental state which could not apply to members of the general public, unless one accepts the troublesome proposition that a single passage in a statute can have different meanings for different defendants. For this reason, the court of appeals refused to apply the heavily regulated industry exception to this case. *Hazelwood v. State*, 912 P.2d 1266, 1279 (Alaska App.1996). The parties have not challenged that decision.

Since none of the exceptions to the minimum *mens rea* requirement of criminal intent apply, our precedent requires the application of a criminal negligence standard as we held in *Speidel* and *Alex*.

### C. Public Policy Precludes Imposition of Criminal Penalties for Conduct That Is Merely Unreasonable under a Civil Standard.

The court accepts the imposition of criminal sanctions for any conduct which "is something which society could reasonably expect to deter." Maj. op. at 883. The court acknowledges that this test affords the legislature complete discretion to impose criminal sanctions upon any conduct which is merely negligent under a civil standard. Maj. op. at 884–885. This approach is fraught with diffi-

---

whereas less severe penalties may be imposed upon a showing of civil negligence.

**4.** Indeed, *Guest* did not concern a "simple negligence" standard, but instead involved a defendant's "reasonable belief." I cannot accept the view that a person's reasonable or unreasonable belief properly can be characterized as "simple negligence." "Negligence" refers to conduct,

not to belief. While a person's belief may be unreasonable, it cannot be "negligent" as such. Therefore, although the concepts of negligence and "reasonable belief" both involve a "reasonable person" standard, they cannot properly be conflated into a single notion, as the court's interpretation of *Guest* requires.

culties, and should not be adopted as a matter of policy.

In my view, notions of fundamental fairness, which underlie all due process issues, require a showing of something more than "failure to act reasonably" before a defendant may be subjected to imprisonment. *See State v. Melendez,* 172 Ariz. 68, 834 P.2d 154, 157 (1992) ("The touchstone of due process ... is fundamental fairness."). Professor LaFave notes that a "general feeling" has arisen among judges that

> [S]omething more [i]s required for criminal liability than the ordinary negligence which is sufficient for tort liability. The thought [i]s this: When it comes to compensating an injured person for damages suffered, the one who has negligently injured an innocent victim ought to pay for it; but when the problem is one of whether to impose criminal punishment on the one who caused the injury, then something extra—beyond ordinary negligence—should be required.

1 Wayne R. LaFave & Austin W. Scott, *Substantive Criminal Law* 326 (1986). This position is persuasive. Civil negligence provides an acceptable standard of fault for allocating any burden which neglectful conduct creates. However, that standard does not provide an adequate basis for levying a separate punishment on a neglectful person. In particular, a punishment of imprisonment is sufficiently severe that it should not be imposed, with the possible exception of the cases noted, for conduct which involves only civil negligence. The right to due process would support imprisonment for a truly gross deviation from "reasonable" conduct. It does not, in my view, support imprisonment for every deviation whatsoever from "reasonableness."

Our current definition of criminal negligence demonstrates the prevailing view that something greater than civil negligence should be required to authorize criminal sanctions. Alaska Pattern Jury Instruction (Criminal) 81.900(a)(4) provides that "[c]riminal negligence is something more than the slight degree of negligence necessary to support a civil action for damages and is negligence of a degree so gross as to be deserving of punishment." This definition suggests that the "slight" degree of negligence required for civil negligence is not "deserving"

of criminal punishment. Moreover, this standard is specifically calculated to "insure[ ] that proof of ordinary civil negligence will not give rise to criminal liability." Commentary on the Alaska Revised Criminal Code, Senate Journal Supplement No. 47 at 142–43, 1978 Senate Journal 1399, *quoted in Andrew v. State,* 653 P.2d 1063, 1066 n. 5 (Alaska App.1982). Of course, the fact that the legislature has restricted criminal punishment to conduct which is more culpable than "slight" civil negligence does not render the legislature constitutionally forbidden to abrogate that restriction. However, the current definition of criminal negligence provides a persuasive argument that societal notions of fundamental fairness do not permit imprisonment for the simple neglectfulness embodied in the civil negligence standard. Such notions, in turn, shape the right to due process.

It is well established that "[m]ere negligence is insufficient to justify an award of punitive damages." *Johnson & Higgins of Alaska Inc. v. Blomfield,* 907 P.2d 1371, 1376 (Alaska 1995) (holding that punitive damages may only be awarded "where the wrongdoer's conduct can be characterized as outrageous, such as acts done with malice or bad motives or a reckless indifference to the interests of others.") (quoting *Bridges v. Alaska Hous. Auth.,* 375 P.2d 696, 702 (Alaska 1962)); *see also Restatement (Second) of Torts* § 908 cmt. b (1965) ("Punitive damages are not awarded for mere inadvertence, mistake, errors of judgment and the like, which constitute ordinary negligence [but are restricted to] conduct involving some element of outrage similar to that usually found in crime."). It is difficult to accept the proposition that an action which cannot form the basis for a punitive civil award fairly can be sanctioned with imprisonment. Admittedly, the prohibition of punitive damages for conduct which is merely negligent has not been constitutionalized. However, this prohibition provides yet another strong indication that judicially accepted notions of fairness foreclose the imposition of explicitly punitive measures for conduct which is negligent under a civil standard.

Since I cannot accept the proposition that imprisonment is a fundamentally fair punishment for civil negligence, I cannot support

the court's decision to remove all due process barriers to the criminalization of negligent conduct.[5] Issues of substantive due process are issues of public policy at their most basic level. I cannot agree that public policy is served by giving legislators free rein to impose criminal sanctions upon whatever conduct a jury may find to be unreasonable.

### III. CONCLUSION

I cannot agree, either as a matter of policy or a matter of precedent, that a person may be subjected to criminal liability upon a showing of civil negligence alone, except in rare circumstances. In my view, the heightened punishments contained in criminal statutes are constitutionally permissible only when a defendant is proven guilty of conduct that is, at a minimum, grossly negligent. I would affirm the decision of the court of appeals.

**5.** I also must take issue with the court's assertion that property and liberty interests are afforded the same protections under the right to due process. Maj. op. at 885. Both property and liberty interests are protected under the Due Process Clause. However, it is inaccurate to say that the same protections apply to both interests. The principle that deprivation of liberty is a more serious act than a deprivation of property, and one which requires greater protections, has surfaced before in our jurisprudence. *See Rice,* 626 P.2d at 116 n. 1 (Matthews, J., concurring) (stating that all cases which carry the possibility of incarceration must include a *mens rea* requirement, unlike cases which do not). Indeed, the distinction between civil and criminal law rests entirely on the potential for imprisonment accompanying criminal prosecutions, and the absence of such potential in civil actions. I therefore find the contention that due process concerns are satisfied in a criminal context by the same standard which serves in a civil context to be unpersuasive. Maj. op. at 884–885.